F. L. HEALEY, Special Administrator, Appellee, v. LEONARD RAY ALLEN et al., Appellants.

No. 45102.

1304

FEBRUARY 13, 1940.

SUPPLEMENTAL OPINION AND REHEARING DENIED
SEPTEMBER 27, 1940.

SECOND REHEARING DENIED JANUARY 17, 1941.

Healey & Reynolds, for appellee.

E. L. Carroll, for appellants.

BLISS, J.—Burgess Allen, a childless widower, past 80 years old, died intestate on May 24, 1938, leaving as his only heir, his grandson, the defendant Leonard Ray Allen, who had just reached his majority. The latter, on his own application, was appointed administrator. The deceased had made a will giving his small estate to this grandson, but to avoid the expense of

administration he had executed conveyances of his real estate to the grandson, a few months before his death. He was afflicted with a cancer which had eaten away an eye, a large part of his nose and other parts of his face. The grandson was a son of a son of the deceased. His mother had died when he was about two or three years old, and his father had died when he was about 13 years old. He had lived with his paternal grandparents for a time after his mother's death, and later made his home in Colorado for a time. Still later he lived intermittently with these grandparents, for short periods. His grandfather had a small acreage on the edge of Creston, which he desired the boy to take charge of, while the former was still able to give him some direction.

On March 5, 1938, the grandfather and grandson went to the office of Thomas Mullin, a lawyer, who had advised the grandfather in other matters, and who had drawn his will. Their mission was to have the grandfather execute and deliver deeds of real estate to the grandson. Mullin was out of the office, and his brother, who was not familiar with the grandfather's business prepared two absolute warranty deeds, which the grandfather executed and delivered to the grandson. These deeds were immediately placed on record. When Mullin learned of this, knowing that the grandfather had desired to reserve the use of the property during his life, he got in touch with the grandfather. The latter and the grandson again came to Mullin's office, about March 19, 1938, to have the conveyances corrected. The grandson then executed two deeds reconveying the property to the grandfather, and delivered them, together with the two deeds of March 5th to the grandfather, and he then executed three deeds to the grandson. All of the deeds were then delivered to Mullin, to be held in escrow, as evidenced by a writing executed by the grandfather. This writing was addressed to Mullin, and recited the execution by the grandfather of the three deeds of March 19th, and that they were delivered to Mullin, on this condition: "You are instructed to hold these deeds during my life and at once following my death to deliver

them to said Leonard Ray Allen, provided, however, I do not during my lifetime call upon you to deliver it back to myself.''

The grandfather's wife had died in June 1937. It appears that, for some months in 1937, Mr. and Mrs. Schad and their family had lived in the home of the grandfather. After the death of the grandmother, they remained with the grandfather until August 1937 when he let them go. At this time the grandson was present and heard his grandfather talk with Mrs. Schad and state to her that they were paid. Mrs. Schad in no way disputed him. The Schads never made any claim to the grandfather that he owed them, although he lived about nine months after they left his home. This appears as part of the plaintiff's case. So far as the record discloses, the old gentleman died in the belief that he owed the Schads nothing. He had money in the bank during all of this time. It appears that he paid his bills promptly. This is evident from the fact that, with the exception of the Schad claim, and the funeral expense, the only claims filed against the estate were the following: Central States Electric Co., $2.24; Iowa Southern Utilities Co., $2.27; Dr. A. S. Beatty, $22.75; Dr. Keith, $39.50; John M. Hood, groceries, $30.25. The grandson paid the last two accounts. The Schad claim was established by a judgment in the sum of $432 on October 26, 1938. It was thought that the deceased had around one thousand dollars in the bank at his death, but his balance at that time was but $118.62.

On May 28, 1938, Mullin, in compliance with the escrow writing, delivered the deeds which he held to the grandson.

It appears from the testimony of the grandson, as a witness for the plaintiff, that, during the years 1936 and 1937, when he had been steadily employed as a farm hand for over three years, he had assisted his grandparents. The grandfather then owned a quarter section farm, apparently heavily mortgaged. The boy on two occasions had his employer give the grandfather a check for $100, each time. At other times he gave him smaller amounts. On one occasion he paid for a hog out of his wages on the farm, and butchered it for his grandfather. He also furnished money to send him to a cancer sanitarium. He

made no claim that this money was consideration for any real estate transfer. He admitted that the transfers were gifts, and without consideration, except that he agreed with his grandfather, and it was a condition of the transfer, that he would give his grandfather as good a burial as the latter had given his wife. The casket, vault, and other funeral expenses of the grandmother were $550. The undertaker had no casket of the same type as that used for the grandmother, so the boy bought one a little more expensive for his grandfather. The entire funeral expense, including new burial clothes was $615.85. The grandson had expected there would be cash enough in the bank to pay this expense. He then began to try to dispose of the residence property involved in this action. And this is the only property involved in the trial below or on this appeal. After his wife's death, and in the fall of 1937, he had traded the equity in the quarter section for this residence property and perhaps another town property, and around $1,000 or $1,500 in cash. This residence property is about a mile or more from downtown Creston. The house was forty or more years old and quite badly run down. The grandson had practically closed a deal with one Cipra, who was to take the property at $550. He had had the abstract examined. The grandson then told him he thought he had a little better deal and asked to cancel the transaction. Cipra said he did not care in particular, and canceled the deal, upon condition that the defendant pay for examining the abstract.

This defendant had gone to Ralph Roland, the undertaker, who was an old time friend of the grandfather, and had performed the funeral services for his wife and son, and proposed to him that he take a deed to the property in full satisfaction of his undertaking account of $615.85 and $35 which this defendant had borrowed from him. Roland accepted the offer. He had a son, the defendant Robert Ricedorff Roland, recently married to the defendant Margaret Rae Roland. They were living with Ralph Roland. The son worked for his father, and the latter was indebted to him. A child was about to be born to them, and Ralph Roland directed the defendant Leonard Ray

1308

Allen to convey the property direct to Robert Ricedorff Roland and wife, that they and their family might have it for a home. Such a deed was executed on June 13, 1938, and put of record on June 18, 1938. Roland and son immediately began making needed repairs on the place. The story and a half house and garage were painted with two coats. The plumbing and furnace were repaired. The foundation had receded from the frame work. The plastering needed repairing. New screens, glass and window frames were put in. The lot was cleaned up. The undisputed testimony is that $400 was spent in this repair work, and the items were given.

Not until June 22, 1938, was the Schad claim filed in the estate. On June 30, 1938, the claim was amended and the deed from Burgess Allen to his grandson was asked to be set aside. No other claim had been filed other than those heretofore noted. The plaintiff was appointed special administrator, and on order of the court was authorized to institute these proceedings. On July 13, 1938, he filed petition herein asking that the conveyances of this residence property, from Burgess Allen to Leonard Ray Allen and from the latter to his two co-defendants, be set aside as in fraud of creditors of the estate.

Testimony for the plaintiff respecting the value of the property is as follows: The plaintiff, who never saw the property until the trial, and who was never inside of it, said it was worth $1,500; a real estate man said it was worth from $1,250 to $1,500. These valuations were as of the time of the trial on February 14 and 15, 1939, after the repairs of $400 had been made upon it. It is true, they each testified that, if its condition was the same on June 13, 1938, and on March 5, 1938, they would say the valuation was the same on those dates. The record is that the conditions were not the same. Plaintiff's testimony also showed the Cipra deal of $550, and further that, after some repairs had been made, Roland sold it to one Kittleman for $800, but, after the latter heard that there might be litigation, he deeded it back. The appellants' testimony placed the valuation in March and June 1938 at $700.

The trial court based its decision solely upon the ground

that the conveyances should be set aside, because of the fraudulent intent alleged. We have gone carefully through this record and find no evidence supporting a finding that this old gentleman had any intention, in conveying this piece of property to his grandson, of delaying or defrauding any creditor. So far as the record shows there is nothing to indicate that he thought he had a creditor except as to some current bills. Neither do we find that the grandson nor his co-defendant grantees nor Ralph Roland had any such knowledge or intention. The Rolands disclaim any knowledge of the Schad claim. It was not filed when the deed to them was made. It is true that the elder Roland saw the Schads in the Burgess Allen home, and that Burgess Allen often talked over business matters with him, and that he knew of the making of the deeds in March, but these matters in nowise warrant a finding that he had any knowledge of, or fraudulent intent or participation in, a transaction to defraud any creditor of the deceased, or to delay the collection of any claim against him or his estate. It is true also that the grandson did not believe the Schad claim was a just one, but this was because his grandfather had told him that he owed the Schads nothing, and his own personal knowledge of the matter. The plaintiff sought to prove by this witness that he and his grandfather had agreed upon the transfer of this property in order to defeat the collection of the Schad claim. The testimony of the grandson was in direct and definite denial of any such intention or agreement. The plaintiff vouched for this witness in making him his own, and, while he had the right to dispute his testimony with other witnesses, if any were available, he did not do so, and his testimony stands uncontradicted.

█ It is our judgment that the evidence and the record as a whole does not warrant a finding that there was any fraud either actual or constructive in the transactions herein set forth. It is very questionable whether the property was worth much, if anything, in excess of the funeral charges and the $35 borrowed. The offer of Cipra was $550. Kittleman bought it for $800 after some repairs had been made upon it. This is con-

crete evidence of value, much more convincing than opinion testimony. It was offered as a part of the plaintiff's case. Appellant's opinion testimony placed the value at $700 prior to the improvements. Appellee's opinion testimony was all after the improvements had been made. If there was any excess value over and above the funeral expenses, it was of such slight amount that the consideration could not be called so inadequate as to justify a finding of constructive fraud as against any creditor. The sale to the Rolands was, in our judgment, made in good faith. The improvements were made in good faith, and the Rolands should be protected with respect to the expenditures made. It is our conclusion and judgment that the deeds executed by Burgess Allen conveying the said residence property, described as the north 75 feet of lot 57 in Swigert's second addition to the city of Creston, Union county, Iowa, to Leonard Ray Allen, and the deed executed by him, conveying said property to the defendants Robert Ricedorff Roland and Margaret Rae Roland, and filed for record in the recorder's office of Union county, Iowa, on June 18, 1938, were each and all valid conveyances, for adequate and valuable consideration, and should be sustained, and that the relief prayed for by the plaintiff should have been denied.

It is therefore our judgment that the decree appealed from should be, and is, hereby reversed in all of its provisions, and it is hereby remanded to the district court for entry of decree in conformity to our conclusions and judgment as stated herein. —Reversed and remanded.

HAMILTON, C. J., and SAGER, STIGER, HALE, MILLER, RICHARDS, and OLIVER, JJ., concur.

SUPPLEMENTAL OPINION.

REHEARING DENIED JANUARY 17, 1941.

BLISS, J.—What we here say is merely supplemental to our opinion of February 13, 1940, reversing and remanding the

decree appealed from. We make this addition because it was argued on petition for rehearing that the opinion was a departure from our decision in Orris v. Whipple, 224 Iowa 1157, 280 N. W. 617. Such an inference might possibly arise because in the statement of facts we set out an escrow agreement, which was introduced in evidence, providing that the grantor might repossess the deed during his life. That part of the statement might well have been omitted, although it was properly a part of the history of the case. The escrow agreement had no bearing upon the determination of the case, and the holding in the Orris case had no application whatsoever. It was also urged that the conveyance was a voluntary one, because the grantee stated that the grantor had given him the property. The deed on its face recited valuable consideration and testimony introduced by the plaintiff established valuable consideration. The rehearing is denied.—Reversed and remanded.